and Abramov. We have Mr. Altman for Mr. Muratov. Good morning, Your Honor. Good morning. Mr. Brissenden for Mr. Abramov. Good morning, Your Honor. Good morning. And Mr. Thomas for the government. Good morning, Your Honor. All right. Great. All right. So, Mr. Altman, you'll proceed first. I see you reserved one minute for rebuttal. You have four minutes now. Thank you, Your Honor. Good morning, Your Honors. I please the court. I'm Gabriel Altman, and I represent Shiloh Muratov, the defendant's appellant. I'm before you today to accentuate two issues that occurred during Mr. Muratov's trial, where the government transgressed on two fronts, neither of which were remedied by the trial court. First, the government never should have been allowed to introduce the 404B evidence concerning the events at the jewelry conventions in Miami and Las Vegas. The case and the trial and the fraud was against diamond merchants in India while the jewelry shows were in Miami and Las Vegas. Qualitatively, there's a difference between a fraud abroad versus one committed at home. The lower court, in fact, knew... Excuse me. Can you verify for me what is the Miami or Las Vegas that the government introduced evidence of? It's essentially guilt by association, right? Guilt by association is not a bad act, right? The 404B relates to situations in which the government seeks to introduce evidence of a crime or bad act that was committed by the defendant that is separate from the scheme of charge. I understand that is what you're saying when you say this was a different scheme in Miami than the scheme in India, but what is the prime scheme? I don't see that Mr. Abramov in particular, but even Mr. Muratov was shown to have done anything that was criminal to any of the people with whom they dealt in Miami or Las Vegas. So, your honor, it's the manner in which Mr. Muratov had essentially committed a check fraud, right? So it's Mr. Muratov's crime that shouldn't have been allowed? Because it's essentially right along... It's set in the same breath as Mr. Muratov's attendance and presence there, and it's being used to demonstrate some sort of knowledge on Mr. Muratov's part. Yes, I thought what was being offered by the government that had some sting here was that Mr. Muratov said something like, we know what's going on here, you're not planning to pay. And that's the evidence that takes place in the United States that has some impact here. And the question is, is that relevant or not? I would have thought, but let's get back to Muratov. Isn't evidence that Muratov committed some crime, something that the government is entitled to offer as bearing on the credibility of its own witness? Yes, and I agree that they can essentially present evidence bearing upon the credibility of their witness. So then are you saying that there should have been a limiting instruction? I think the evidence shouldn't have come in the way that it came in. Ultimately, he was allowed to testify over defense counsel's objection. And frankly, whatever value that there would have been was already elicited, right? There was already testimony that Mr. Muratov presented himself as a member of Millennium, that he had worked, for lack of a better term, alongside Mullah Kandas. Let's go back to Judge Lynch's first part of his question, which I also didn't understand. There's no argument by the government that when he paid for this bracelet with a check, that your client was in any way, at that point, knowledgeable that the check would bounce, was involved in some kind of fraud. They only offered it because they argued through the testimony that he later learned that it did bounce, and that that was evidence that he knew that they couldn't pay for the diamonds in India. So there was no allegation at any point that your client had anything to do with some kind of fraud related to the bracelet, right? I would argue that given the temporal context, based on how it was presented, it lends a very strong inference that Mr. Muratov was, in fact, involved in somehow perpetrating a fraud here domestically against merchants at the Miami Jewelry Show, and that's what makes it particularly problematic. Wasn't that check paid, eventually? So, as Mr. Muratov testified, it was not paid. Do you want to spend a moment on the conscious avoidance issue? Yes, your honors. Thank you. So our issue with the conscious avoidance instruction is that the government's theory throughout the pendency of the trial was actual knowledge of the conspiracy to defraud the Indian diamond merchants. However, and so there was no factual predicate for the conscious avoidance instruction. The government's theory... I'm not sure I understand that either, Mr. Altman. I mean, I've never really... This argument comes up all the time and I've never understood it, so maybe you can help me this time. The government had some evidence in the form, at least as Mr. Muratov, that he said, we know what's going on here. But mostly, aren't they arguing from circumstantial evidence that anybody in the position of these defendants would have, should have, must have known, based on all these red flags, that the people they were working with had no intention of paying for the diamond. Now, again, whether that is correct or not, isn't that the argument they were making? So I agree with... I understand your honors, let's say confusion, because it is a very nuanced distinction. But ultimately... I understand the distinction perfectly well. The distinction is, when they argue based on A, B, C, D, E, F, G, red flag, these defendants must have actually known, is a different thing than an argument that asks the jury... And you don't even have to make that inference, you have to make that leap to actual knowledge, because willful blindness, they must have closed their eyes to A, B, C, D, E, and F. And since those things make it so clear that there was something wrong, there was willful blindness. So I don't understand how you can say there is a sufficient factual basis that if there had been no willful blindness instruction, the evidence would have been sufficient to find actual knowledge. But there's no factual basis for the fallback argument of willful blindness. So here, the evidence was all focused on actual knowledge. And so their argument with respect to these red flags, if you will... So the red flags, standing on their own, are readily explainable by what the defense was, that Muratov and Abramov understood this to be legitimate business, they were appraisers. And if you look at the case law that the government cites for conscious avoidance, ultimately, those defendants knew, and they expressly stated that they had suspicions, there were problems that they recognized, but they sort of closed their eyes to it. Whereas there was no such evidence here, it was all that the evidence was directly that Mr. Muratov knew, that came from an interested co-conspirator. Exactly. The government offers a piece of evidence as to actual knowledge. The jury doesn't have to believe it. The jury can discredit that testimony. So then where are we? If the jury discredits that testimony, but it believes that there were sufficient red flags, that anyone who saw those red flags must have closed his eyes to the obvious fact of what was going on. Supposedly he asked a question in a note. That's what we think happened here. Are they guilty? Isn't the answer clearly yes? In the hypothetical that you described, sure, but there wasn't... Why isn't that so when the judge gives the instruction up front? That if you find this particular set of hypothetical circumstances, maybe the judge privately thinks, you know, I think they're going to find that they knew because I believe this witness and so should they probably, but it's not for me to decide. The jury might discredit that, and I have to give an instruction of what happens then. Why isn't a willful blindness instruction perfectly valid based on the evidence that supports the possibility, A, that they knew, and B, that if they didn't actually know, if they didn't actually say in their own mind, we're in this with a bunch of guys who don't plan to pay, that the only reason they didn't say that to themselves is because they chose not to say that to themselves. They chose to blind themselves to the red flag. Because there must be ultimately some sort of a factual connection between the theory as charged and the actual evidence. If there, for example, if there's no indication that Mr. Muratov and Mr. Abramov actually closed their eyes to anything, if that's never been regarded, or in one of the cases cited by the government, there's a bribery case where the businessman says, you know, I have doubts as to how they're actually getting these contracts. You know, then I understand the conscious avoidance instruction. But here, there was no such factual predicate, and that's why I keep falling back on that phrase. Ultimately, it was actual knowledge. And accordingly, that's what they're in is where the instructions should have ended if there was. Okay, I understand. I understand your right. Thank you, Mr. Altman. We'll hear from Mr. President for Mr. Abramov. Thank you. Good morning. My name is Matthew Brissenden. I represent Mr. Abramov. Mr. Abramov's argument hinges, I think, on two central questions. Number one, did the government pursue a right to control theory at trial? And number two, if so, was it required to plead that theory within the four corners of the indictment? And I would respectfully submit that the answer to both of those questions is yes. Prosecutors argued from the pretrial conference right through summation, they consistently argued that they were not required to prove or demonstrate that the defendants in this case knew or believed that the diamonds would not be paid for. They argued that it was enough to were induced through misrepresentations to enter into transactions that they would have otherwise avoided. Mr. Brissenden, I know that's your argument, but I went back and looked at the government's summation. I read the whole thing, and literally five sentences in, they say Muratov and Abramov ordered millions of dollars in diamonds they never intended to pay for. There's like about 12 times during the indictment where they say over and over again, even in the good faith issue, they had no sincere belief that there would be payment. It was a consistent theme throughout, so I'm having a hard time. I know they did argue in some of the submissions. I know that footnote in that one letter, but in terms of what they were arguing to the jury, they were arguing over and over again that there was knowledge from the beginning that there'd be no payment. They wanted to argue that all the misrepresentations could be considered, not just the promise to pay, but in terms of your client's intent. Wasn't that their argument all along? I think, your honor, that the government ultimately ended up taking sort of two separate taxes, and I don't disagree. Listen, the defense here was that these clients, they were low-level employees, and they didn't understand the intent of their employers. They didn't understand that this was, in effect, a bust-out scheme, and the diamonds wouldn't be paid for, and in response, the government offered up two arguments. The first argument was that, as your honor indicated, the evidence is sufficient to find for you, the jury, to infer that these defendants, in fact, did know what was going on, and so certainly, there's no question that was part of the government's argument in summation, but they had this very, very powerful fallback argument that they could then make, which they sort of cloaked in the no ultimate harm instruction. Wait, wait, Mr. Brisson. You're saying they had this fallback argument that they cloaked. Are they not entitled to argue, in furtherance of the theme that they knew all along that this was a bust-out scheme, that they made misrepresentations about things like, did they know these people, were they all part of the same group, and why would you say that to someone? The government could argue, I think, why would you say that to someone, unless you were trying to get them to do something that they wouldn't otherwise do, so that you could then get the diamonds and not pay. Isn't that, why do you say that's cloaking? Isn't that a legitimate argument to make? No, I think you're exactly right, your honor. I think that that was the legitimate argument, and I think that was a proper argument to make in front of the jury. What I'm trying to say is that there was this fallback argument that prosecutors made, and that argument was, even if you believe that these defendants thought that someone was going to pay for the diamonds, that's not a defense in this case. They were able to argue because they obtained this no ultimate harm instruction. But isn't that a correct instruction? I disagree that it was a correct instruction in this case, your honor. I think it's actually an with a right to control theory. So, for instance, in a bank fraud case, it makes a lot of sense to provide that no ultimate harm instruction. You obtain the loan, it doesn't matter if you intend to pay the loan back, and therefore it becomes a control case. Then there was really no place for that no ultimate harm instruction, because the defense here was that these defendants went into these transactions in good faith, not anticipating that there would be any loss, not that there would be an immediate loss, followed by the victims being made whole sometime down the road. Their defense was, we believe these were legitimate transactions, making the no ultimate harm instruction. But the no ultimate harm instruction has to do with, do you think it will all come out okay in the long run somehow? I mean, didn't the government refer to this as the payment ferry defense? Right. That doesn't sound to me like an argument that even if they believed in good faith that the people they were working with did intend to pay, they intended to pay in a timely way. This was all, they believed this was perfectly all fine. Why would you call that a payment ferry defense? They're saying, it seems to me, if you find beyond a reasonable doubt that defendants knew that the people they were working with had no intention of paying, some fanciful belief or purported belief on their part that it would all come out okay anyway is not a defense. But I don't think that's what the government was seeking to convey to the jury. Because listen, the defense never suggested that some third party was going to come along and pay for these diamonds. The defense all along was we thought our bosses were going to pay for them. What difference does that make? What difference does it make if you knowingly make fraudulent statements in order to induce somebody else to extend credit? What difference does it make? You are defrauding the person out of not extending the credit. And even if it does, even if the loan is ultimately repaid, you've still committed a fraud. But I think that's the exact point that I'm trying to make here. I agree with you under a right to control theory. And our fundamental argument is that right to control theory was not flagged in the four corners of the indictment as required by this court's holding in United States versus Shelling. Did the judge ever give an instruction about a right to control theory? The judge did not expressly charge the jury on a right to control theory. When I was reading this argument, I thought, you know, this is a fairly arcane kind of theory. It's the would lay jurors come up on their own with the idea that, oh, they really did believe that there would be payment. But it's still a fraud if people were induced to buy lies to make a decision about what to do with their assets that they wouldn't otherwise have done. I mean, that's an interesting argument for a court. It may well be perfectly correct as a statement of law. But this is something the jury would have intuited based on something that the government said with respect to what they repeatedly said was proof that the defendants knew all along that there was no intent to pay. And then the jury would somehow, despite the judge's repeated instruction that what I say is the law, not what anybody else says, that somehow the government was telling them that there's despite the control theory thing. And you can rely on that to convict. It just seems to me just not what happens in trial. Well, Your Honor, number one, I think this theory and this notion was very much placed in front of the jury. And as I said, it was an alternative argument, but it was very much put in front of the jury when the government formulates liability by saying you're guilty if you lied to obtain diamonds. That is, in essence, a right to control theory, this notion that the merchants had the right to make informed decisions about who they were selling the diamonds to. And so in that sense, the argument was put in front of them by the prosecutor. And then I think the instructions contributed to the problem in two ways. Number one, because the district court declined to provide the instruction requested by defense counsel, which would have required the jury to find that the defendants acted with an intent to obtain the diamonds without paying for them. And number two, because, as I said, the court provided this no ultimate harm instruction, which, in fact, frequently goes hand in hand with the right to control. Was that instruction objected to? It was objected to. It was during the charge conference. Actually, the record is somewhat confusing because during the charge conference, defense counsel says, listen, this is not our defense that ultimately paid hell. Our defense all along is that our clients believe that these were legitimate transactions. And in response, the district court says, you know what, you're right, I'm not going to provide it. And then at some point between that moment and when the charge actually happens, the district court changes its mind. We don't know the exact reasoning, but the charge is ultimately provided. All right. Thank you, Mr. President. We'll hear now from the government. Mr. Thomas. Good morning and may it please the court. The panel is absolutely correct. The government's argument to the jury was the same one described in the complaint and charged in the indictment. The defendants obtained millions of dollars in The government, as the panel has already pointed out, made that argument explicitly to the jury multiple times. Mr. Abramov's theory on appeal that the government argued in the alternative that the defendants could be convicted of a conspiracy to merely deprive the victims of important economic information was not argued to the jury at all, nor was it referenced in district court's instructions. Mr. Thomas, they point to this letter that I read. The government did seem to argue to the judge that there was this alternative theory. Was it not in the letter? No, Your Honor. There's a footnote in the letter that articulates all the different types of harm that had been proven up to that point in trial, that is to evidence to the court why it is that the defendant's request for an erroneous legal instruction was already at odds with the proof. And that letter tracked different types of harm that sort of tracked the effects of the conspiracy in time. And so the first harm, of course, that the conspiracy visited upon the victims was to trick them into doing business at all. But, of course, the government proved and argued that that was merely the first along a continuum that ultimately concluded with an intentional non-payment for the diamonds, but if you're going to argue, for example, increased credit risk exposure was the harm, that would be a right to control theory, right? If that was the harm you were going to rely on, that would be right to control, wouldn't it? Your Honor, if all that had happened was that defendants were subjected to an increased transactional risk, like credit risk, that would be a right to control type harm, and then it deprived the victims of important information about deciding whether to engage in the transaction at all. But, of course, the government didn't argue that, and that argument wasn't stressed to the jury. So you're saying you just wanted to argue all those misrepresentations as part of the scheme to get the diamonds without paying for them. Is that essentially what your position is? Your Honor, I think, yes, it's important to disambiguate two things that which is the property that was the object of the underlying mail fraud scheme, which the government consistently throughout the case said was diamonds, and that the defendants intended to deprive the victims of diamonds, and separately, the mens rea that was required for the jury to find guilt. What Mr. Abramov attempted to do below was to have the court misinstruct the jury that there was some bespoke mens rea, not intent to defraud, but for him intent to steal, that they were required to find for his guilt. And it's in that context that the government opposed that instruction and told the court that, of course, that's not the law, and there's all sorts of other satisfactory proof upon which the jury could find that there was intent to harm. The court asked questions about the no ultimate harm instruction. That instruction's language came from language the parties jointly proposed. That's at docket 303. And although there were misgivings by Mr. Abramov in that initial conference, there's no mystery where it ultimately ended up before the jury, because what happened after that charging conference is that the court allowed and the parties did brief this very issue. At the conclusion of that briefing, the court said on the record, in light of what I've now learned about where this is going and what the party's arguments are, I've fleshed out the good faith concept. And it went back into the instructions. And thereafter, for two or three days, the defendant had repeated opportunities to object and didn't make an objection. And ultimately, it was delivered to the jury without objection. To turn, if I could, to the evidentiary arguments, Mr. Muratov asserted that the evidence related to the jewelry conventions in the United States was qualitatively different. Obviously, that is both factually false, but also ignores the fact that the conspiracy also operated in the United States out of the Diamond District, and in fact, in Las Vegas. As Judge Lynch pointed out, there was a critical confrontation where the defendants asked the cooperator, essentially, we see this won't be paid ever, we want you to grease us up. So I think that that claim obviously can be rejected. With respect to conscious avoidance, as the court was getting at, the factual predicate was not direct evidence that the defendants closed their eyes, but enough circumstantial evidence from which the jury could conclude that that is effectively what they did. And here, the scheme, as various members of the panel pointed out, had all sorts of different aspects that called out for inquiry, the lies about who they were, where they worked for, that they didn't know each other, that they would be paired up with people who knew nothing about diamonds working for companies that were just created. All those things would be sufficient for a juror to conclude that the defendants had, in fact, closed their eyes. If the panel has no further questions, the government will rest on its submissions and urge the panel to affirm. All right. Thank you very much, Mr. Thomas. We'll hear now, Mr. Altman, you have one minute in rebuttal. Thank you, Your Honors. As the government argues, there were too many red flags to ignore. That's just simply not the case. If we run through them, for the most part, they're all readily explainable by the defendant's understanding of what this business, what this operation entailed. And so ultimately, it cannot be said that the evidence of the defendant's actual knowledge was so overwhelming as to allow for the alternative theory of conscious avoidance to also be presented as an instruction. It doesn't have to be so overwhelming, does it? It just has to be sufficient for the jury to draw that inference. You just made a perfectly sound jury argument that they should not find conscious avoidance beyond a reasonable doubt. And it is almost identical, it seems to me, to the argument that you would have made and I believe did make to the jury that once you discount the purported evidence that comes only from a cooperator that they admitted to their knowledge, or at least that Muratov did that, once you've not good enough for you to infer beyond a reasonable doubt that they had actual knowledge. I mean, that's the same argument. And it's a jury argument, which they can credit or not credit. I agree with your honor. I would also say that in light of the general lack of evidence surrounding the willful blindness component, there shouldn't have also been a conscious avoidance instruction. The government does not get the benefit of every theory it would like and, you know, to throw it against the proverbial wall to see if they can get a conviction. I think here, it was a close enough call to ultimately at least raise a reasonable probability that the jury convicted on the basis of a faulty conscious avoidance theory as opposed to the actual knowledge theory. All right. Thank you, Mr. Altman, Mr. Brissett, and you also have one minute. Thank you. I'm sorry. Just briefly, I have difficulty reconciling the government's position as it recounts it now with the position which it took in the lead up, especially throughout the trial and then the lead up to summation. The government is now maintaining that it had no interest in pursuing this sort of right to control theory, but why was it then at the time when defense counsel asked the jury to be instructed that the jury would need to find that these defendants intended not to pay? Why did the government vigorously object to that instruction? That was, in fact, the government's theory and, of course, they were successful in stopping the jury from hearing that instruction. As far as the objection to the no ultimate harm instruction, that could be found at A832 to A843. This notion that defense counsel raised his objection in the charge conference that the court then ruled against him and that he has somehow forfeited by not continuing to raise it, I don't think there's any basis in the law for this notion that that objection was not preserved. And finally, the last thing I guess I would say is as far as there being a constructive amendment or a prejudicial variance, those sometimes occur because of the instructions provided by the court, but it doesn't have to be accompanied by an express instruction by the court. It can be the presentation of evidence itself which lends itself to that constructive amendment or prejudicial variance, and I think very much that's what happened here. And it was certainly aggravated by the instructions, but it was the argument that forcefully that really cut the legs out of the defense here, that good faith defense that we believe the diamonds would be paid for and ultimately rendered it almost a nullity. Thank you very much, Mr. Brisson, and thank you to all of you. We will observe decision. Have a good day. Thank you. Thank you, Your Honor.